MINNEAPOLIS IRON STORE COMPANY v. THE E. G. STAUDE
MANUFACTURING COMPANY.
G. WATSON FRENCH AND OTHERS, INTERVENERS.[1]

August 4, 1922.

No. 22,881.

Action of buyer's receivers equivalent to breach of contract to make steel
wheels.

1. The trial court properly treated a contract for the manufacture
and delivery of steel wheels as broken by the buyer. The buyer's busi-
ness passed into the hands of receivers. The receivers had the option
to elect within a reasonable time to continue or reject the contract
as they saw fit. They in effect rejected it.

Seller's damages computed from time of filing claim with buyer's receivers.

2. It was not error to instruct the jury that the breach might be
deemed to have occurred as of the date the sellers filed their claim
with the receiver and that damages should be estimated as of that
date. The seller should be allowed damages as of the time when he
is advised of the rejection of the contract.

Measure of maker's damages difference between cost of unused material,
or its value, and value at time of breach.

3. Under the peculiar contract between the parties the damage was
the difference between the cost of unused material purchased to fulfil
the contract and its value at the time of the breach, or, if the material
was on hand, the difference between its value at the time of its appli-
cation to this use and at the time of the breach.

Verdict for seller sustained.

4. The evidence sustains a verdict based on the amount of unused
material purchased for or applied to this contract as testified to by the
seller.

Seller's claim as to damages sustained.

5. The evidence also sustains the seller's claim as to the cost or
value of the material when purchased or applied and as to its value
at the time of the breach.

[1] Reported in 189 N. W. 596.

The partners composing the firm of French & Hecht filed a claim for $13,313.09 with the receivers of the E. G. Staude Manufacturing Company and their complaint in intervention. The receivers answered that they had been paid in full. The matter was tried in the district court for Hennepin county before Montgomery, J., who at the close of the testimony denied separate motions by receivers and interveners for directed verdicts and a jury which returned a verdict for $9,817.82 in favor of interveners. From an order denying their motion for a new trial, the receivers appealed. Affirmed.

Robert S. Kolliner and Josiah E. Brill, for appellants.

Clapp, Richardson, Elmquist, Briggs & Macartney, for respondents.

HALLAM, J.

In 1917 interveners were manufacturers of metal wheels at Davenport, Iowa. The E. G. Staude Manufacturing Company, a Minnesota corporation, was engaged in the manufacture of tractors at St. Paul. On April 17, 1917, these parties entered into a contract by which interveners agreed to manufacture and deliver 23,000 steel wheels of special design and requiring the use of special material, shipment to be made as directed by the Staude Company. In a letter which was made part of the contract, intervener stipulated that "should you find it necessary through any unforeseen reason to make a change or a cancelation we will not cause you to suffer to any greater extent than the loss which, through your action, may be inflicted upon us on account of materials provided for your wheels."

The defendant, E. G. Staude Manufacturing Company, a South Dakota corporation, succeeded in some manner to the rights and obligations of the Minnesota corporation.

In January, 1919, receivers were appointed to take charge of the property and business of defendant company. On June 18 interveners filed with the receiver a claim for damages for breach of the said contract and after a trial by jury the claim was allowed.

1. The court, in charging the jury, treated the contract as broken by defendant. In this the court was right. Neither party had been free from fault. In the early stages, interveners prepared to carry

out the contract with promptness, but defendant tardily caused delays.    Later, when defendant was anxious for deliveries, interveners, by reason of pressure of war demands, failed to respond.    Each party in turn could have declared a breach by the other, but both waived the right to do so.    Then came the receivership.    There was no evidence that defendant was insolvent.    The appointment of a receiver was not in itself a breach of the contract.    The receivers had the option to elect within a reasonable time to continue it or to reject it as they saw fit.    1 Tardy's Smith on Receivers, § 392; 34 Cyc. 260, 261.    They never in terms rejected the contract, but, from a reading of the correspondence, it is clear also that they never elected to carry it out, and that they in effect rejected it.    For example, they purchased wheels of interveners, but when they negotiated for them they asked for a price and said they expected interveners would require them to pay for wheels as they received them, whereas the contract fixed a price and stipulated for payment within 10 days from date of invoice.

2.    We think also that interveners were within their rights in demanding damages as of June 18, 1919, the time of filing their claim with the receivers, and it was not error to instruct the jury to estimate damages as of this date.    There was no objection to this date on the trial.    There was no objection to the instruction that if there was a breach this was the proper date.    There could be no real issue that this allowed a reasonable time to the receivers. If it could be said that there was an issue of fact as to whether the contract might have been deemed earlier broken, there is nothing to indicate that the damage as of any earlier date would have been materially different.

Where a contract is broken before full performance is due, the injured party may demand damages at the date of the repudiation. Alger-Fowler Co. v. Tracy, 98 Minn. 432, 107 N. W. 1124.    It has been said by one author that the rejection of an executory contract by a receiver constitutes a breach of the contract dating back to the beginning of the receivership.    1 Tardy's Smith on Receivers, § 394. No authorities are cited by the author to this proposition.    It seems to us that, when the breach is of a contract to buy, the seller should

be allowed to recover damages as of the date when he may dispose of his goods or material elsewhere and that is when he is advised of the rejection of the contract by the buyer. This rule is the only one that can properly measure and compensate his loss.

3. Defendant devotes most attention to the claim that the evidence does not sustain the verdict as to amount of damages. Under the contract the limit of recovery was the loss on account of material "provided" for manufacture of the wheels called for by the contract. This loss would be the difference between cost of material purchased and not used and its value at the time of the breach, or if the material was already on hand the difference between its cost or value at the time of its application to this use and its value at the time of the breach.

4. Interveners' principal witness, Mr. Heesch, testified to the amount of material provided especially for the fulfilment of this contract and the cost to interveners of the material so provided, the amount of material left on hand at the time of the breach, and the value at the time of the breach. On this basis he estimated the amount of interveners' damage, and his evidence standing alone is sufficient to sustain the verdict rendered.

But defendant contends that there is other evidence in the case which shows conclusively that Mr. Heesch was in error in his figures. It appears that there was a prior contract between these parties dated March 1, 1917, by which interveners agreed to manufacture and deliver wheels of the same or a similar description. Defendant claims that there was but one prior contract. Interveners claim there were other prior contracts. In this we think defendant is right. The evidence is vague on this point for prior transactions were only incidentally involved. But the written correspondence can leave no serious doubt that there was but one prior contract.

The significance of this fact is right here. Mr. Heesch in his testimony gave: First, the quantities of material which interveners provided for the making of wheels under the April 17 contract; second, the amount of material required for each wheel, and, third, the number of wheels manufactured under the April contract, and in this manner by process of simple mathematics it was easy to arrive at the

material left on hand. Manifestly, if the figures given on either proposition were varied, the result would vary accordingly. Defendant's counsel argue very ably that Mr. Heesch was in error in the number of wheels manufactured under the April contract, that in fact 2,512 more wheels were manufactured under this contract than he said, and therefore, he argues, the amount of material left on hand must be correspondingly reduced and "interveners' claim for damages must be reduced by the amount of shrinkage on material for 2,512 wheels." If his premises are correct his conclusion is correct. The whole fabric of his argument depends on his contention as to the number of wheels manufactured out of material provided for the April contract. Mr. Heesch testified positively that the number was 7,662 wheels, 6,006 delivered before the receivership and 1,656 to the receivers. Defendant's counsel contends that the total figure should be 10,174 instead of 7,662. His argument in detail is this. Admittedly 21,674 wheels were delivered all told "from the first wheel that was ever shipped." He contends that the evidence is conclusive that only 11,500 were manufactured and delivered under the earlier contract, and this would leave 10,174 for the April contract. We do not agree that there is any such conclusive evidence to sustain his contention. The parties evidently paid little attention to this method of calculation on the trial. Defendant's contention hangs solely on a casual statement of Mr. Staude while on the stand that the March contract was for 11,500 wheels. But giving Mr. Staude's testimony all possible weight, it can only be said to raise an issue of fact with much likelihood that his figure was erroneous.

It is manifest from the testimony that 2,297 wheels were delivered before April 17. Mr. Heesch testified that 11,703 were delivered on the first contract after April 17 or 14,000 all told on the first contract. In this he is corroborated by the correspondence that passed between the parties at the time.

On February 9, 1918, Mr. Heesch wrote defendant two letters in each of which he stated that there was a balance of 1,325 wheels still due under the contract of March 1. Defendant answered, commenting on this statement, but not questioning it. At that time 10,643

wheels had been shipped since April 17; 2,297 before April 17, or 12,940 in all; and, if 1,325 more were still to come under the March contract, we have more than 14,000 wheels applicable to that contract.

Again, if we take this figure of 1,325 from the number of wheels delivered after these letters of February 9, we have left 7,616 wheels referable to the second contract or not far from the number given by Mr. Heesch in his testimony.

Again, when notified of the appointment of the receivers, interveners wrote the receivers and defendant that defendant was still obligated to take 16,988 wheels under the April contract. This meant that only 6,012 had then been delivered under that contract. This accords substantially with interveners' claim. The letter was answered by Mr. Staude and no question was made as to the correctness of the figures. It seems plain that the jury were at liberty to accept Mr. Heesch's figures.

5. Defendant contends that the material on hand was undervalued by defendant as a result of taking the mill price which was fixed on a basis of conjectural future delivery of goods, whereas, the goods being on hand, the warehouse price based on what could be obtained for goods on hand and ready for delivery should have been taken, and it is said if the warehouse price be taken no damage could have been sustained. The evidence was quite full on the question of damages. The distinction between mill price and warehouse price was fully explained. The difference between the two as to specially cut stuff is sometimes not much. There is evidence that interveners disposed of the material on hand or used it as best they could. The charge on this point was free from error. We think the evidence on this point sustains the verdict.

Order affirmed.